IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TYLER D. MALINSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| PAULA SMITH, | ) |
| | ) |
| Intervenor, | ) |
| v. | ) Case No. 15-CV-502-JED-FHM |
| | ) |
| BNSF RAILWAY COMPANY, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Before the Court is defendant BNSF Railway Company's ("BNSF") Motion for Summary Judgment (the "Motion") (Doc. 39), which plaintiff has opposed (Doc. 67). The Court has summarized the procedural background of this case in its previous orders. (Docs. 109, 127). For the reasons stated herein, the Court **denies** BNSF's Motion.

**I.    Factual Background**

The following facts are undisputed by the parties. On December 4, 2014, a collision occurred between BNSF 8135, a train owned and operated by BNSF, and a motor vehicle driven by plaintiff. The collision took place at a railroad grade grossing on County Road 210 near Afton, Oklahoma. (Doc. 39 at 6, ¶ 1). The lead locomotive on the BNSF train was equipped with a video recording device that captured plaintiff's vehicle approaching the railroad crossing and the subsequent collision. (Doc. 39, Exh. 6). The video reflects that the lead locomotive was equipped with an event recorder (*i.e.*, a black box), and that the locomotive sounded its horn for approximately fifteen seconds prior to the accident. (*Id.*). The video also demonstrates that the

front of plaintiff's vehicle was approximately ninety-nine feet from the near rail. (*Id.*, Exh. 2, 6). Plaintiff's vehicle was moving at approximately eight-and-a-half miles per hour at the time it crossed the crossbuck.[1] (*Id.*). At the time of the accident, the train was moving at a speed of fifty-five miles per hour. (*Id.* at 6, ¶ 34). The maximum authorized speed on the track where the accident occurred is sixty miles per hour. (*Id.*, ¶ 33).

The horn on the train's lead locomotive was tested ten days after the collision and produced a sound level of 100.5 decibels from a distance of one-hundred feet. (*Id.*, ¶ 31). The train was also equipped with two nose-mounted headlights and two ditch-lights mounted above the front platform. These lights could illuminate a person at least eight-hundred feet in front of the locomotive. (*Id.*, ¶ 32).

The two reflectorized crossbucks at the County Road 210 crossing were installed in March 1981. (*Id.* at 5, ¶ 26). BNSF contends that the crossbucks were installed under project RRO-000S(64), pursuant to the Crossbuck Agreement between the State of Oklahoma and BNSF's predecessor-in-interest, the St. Louis-San Francisco Railway Company. The project was approved and authorized by the Federal Highway Administration. The Crossbuck Agreement further provided that federal funds would pay for ninety percent of the costs to install the warning devices. (*Id.* at 4, ¶¶ 21-26). The FWHA final voucher demonstrates that ninety percent of the installation costs under the Crossbuck Agreement from December 6, 1978 through January 31, 1990 were federally funded. The voucher makes specific reference to project RRO-000S(64). (*Id.* at 5, ¶¶ 26-27).

---

[1] "Crossbucks are black-and-white, X-shaped signs that read 'RAILROAD CROSSING.'" *Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1211 n.4 (10th Cir. 2008) (quotations omitted).

## II. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering a summary judgment motion, courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 at 251-52. The evidence of the non-movant is to be taken as true, and all justifiable inferences are to be drawn in non-movant's favor. *Anderson*, 477 U.S. at 255; *see also Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). When the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id*. (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*,

477 U.S. at 252. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III. Discussion**

BNSF moves for summary judgment on the following grounds: (1) plaintiff violated Okla. Stat. tit. 47, § 11-701(A) by failing to stop for a plainly visible train sounding its horn and was therefore negligent per se; (2) plaintiff's obstruction claim fails as a matter of law; (3) the Federal Railroad Safety Act preempts plaintiff's state law claim related to the adequacy of warning devices; (4) any claims regarding the speed of the train or adequacy of locomotive warning devices are preempted; (5) the Manual on Uniform Traffic Control Devices for Streets and Highways preempts any claim regarding BNSF's duty to install additional warning devices at the crossing; and (6) the statute of repose bars plaintiff's claim regarding the design of the railroad track.

**A. Negligence Per Se**

Negligence per se under Oklahoma law requires that: "(1) the violation of a statute or ordinance must have caused the injury, (2) the harm sustained must have been of a type intended to be prevented by the statute or ordinance, and (3) 'the injured party must be one of the class intended to be protected by the statute.'" *Hamilton v. Allen*, 852 P.2d 697, 699 (Okla. 1993) (quoting *Ohio Casualty Ins. Co. v. Todd*, 813 P.2d 508, 510 (Okla. 1991)). A party's negligence per se breaks the causal chain between a defendant's negligence and the injury if the negligent per se party's actions are the proximate cause of his injury. "Generally, the proximate cause of an injury in a negligence case is for the jury to determine. It becomes a question of law for the court only when there is no evidence from which a jury could reasonably find a causal nexus

4

between the defendant's alleged negligent act and the injury." *Akin v. Mo. Pac. R.R. Co.*, 977 P.2d 1040, 1054 (Okla. 1998).

BNSF asserts that plaintiff violated Okla. Stat. tit. 47, § 11-701(A)(3) and (A)(4). Okla. Stat. tit. 47, § 11-701(A) imposes a duty on motorists approaching railroad crossings to stop within fifty feet but not less than fifteen feet from the railroad when:

> 1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;
> 2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;
> 3. A railroad train approaching within approximately one thousand five (1,500) hundred feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;
> 4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing; or
> 5. The tracks at the crossing are not clear.

Okla. Stat. tit. 47, § 11-701(A)(1)-(5). The Oklahoma Supreme Court has held that a driver's "failure to conform to the requirements of [§ 11-701(A)] is negligence per se." *Akin*, 977 P.2d at 1055. The driver's violation of § 11-701(A) constitutes "*the supervening, and therefore, proximate cause*" of a resulting collision with a train, which "insulates the railroad from the legal consequences of its own lack of due care, if any." *Id.* at 1056 (italics in original).

BNSF argues that plaintiff's duty to stop was triggered under § 11-701(A)(3) and (A)(4), because the train emitted an audible signal and it was plainly visible to plaintiff as it approached. BNSF contends that plaintiff's failure to stop in violation of either § 11-701(A)(3) and (4) constitutes negligence per se and it is thus entitled to judgment in its favor. (Doc. 39 at 9-10). There is no dispute that plaintiff failed to stop his vehicle as he approached the railroad. Nor does there appear to be a dispute that the harm sustained by plaintiff was of a type intended to be

prevented by § 11-701(A)(3) and (A)(4), or that plaintiff was one of the class intended to be protected by the referenced statutes. Nonetheless, the Court finds BNSF has failed to demonstrate that plaintiff violated either § 11-701(A)(3) or (A)(4), and is thus not entitled to judgment as a matter of law.

### 1. Section 11-701(A)(3)

A motorist violates section 11-701(A)(3) by failing to stop when "[a] railroad train approaching within approximately one thousand five (1,500) hundred feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard." Okla. Stat. tit. 47, § 11-701(A)(3). While the evidence before the Court weighs in BNSF's favor, the Court cannot find that the evidence conclusively demonstrates that plaintiff was negligent per se under § 11-701(A)(3).

BNSF's video recording demonstrates that the horn was blown approximately fifteen seconds prior to the collision. (Doc. 39, Exh. 6). Further, a test conducted on the train ten days after the collision produced a sound level of 100.5 decibels[2] from a distance of one-hundred feet. (*Id.*, ¶ 31). However, in order to establish a violation of § 11-701(A)(3), "a signal must be audible from 1,500 feet from the crossing." *Turnbull v. Missouri Pac. R. Co.*, 1991 WL 544257, at *3 (W.D. Okla. Dec. 10, 1991), *aff'd sub nom. Robinson v. Missouri Pac. R. Co.*, 16 F.3d 1083 (10th Cir. 1994). While BNSF may, at most, have demonstrated that the train emitted an audible signal from one-hundred feet away, there is no evidence to show that the signal was audible from approximately 1,500 feet away, as required by the statute. Accordingly, BNSF cannot demonstrate it is entitled to judgment as a matter of law on this ground.

---

[2] Although not at issue in this case, BNSF asserts that this volume complies with the federally mandated decibel range of 96-110 decibels pursuant to 49 C.F.R. § 229.129. (Doc. 39 at 9).

6

BNSF's argument that plaintiff has effectively conceded negligence per se due to his failure to challenge its § 11-701(A)(3) argument falls short. Although plaintiff's Response neglected to respond or provide evidence related to the audibility of the horn, the Court finds plaintiff's lack of response to be immaterial in light of BNSF's failure to meet its initial burden to demonstrate summary judgment is appropriate. *See Murray v. City of Tahlequah, Okl.*, 312 F.3d 1196, 1200 (10th Cir. 2002) ("[T]he burden on the nonmovant to respond arises only if the summary judgment motion is properly supported as required by Rule 56(c) . . . . If the evidence produced in support of the summary judgment motion does not meet this burden, summary judgment must be denied *even if no opposing evidentiary matter is presented*." (citations and quotations omitted) (italics in original)).

### 2. Section 11-701(A)(4)

Under section 11-701(A)(4), a motorist must stop if "[a]n approaching railroad train is plainly visible and is in hazardous proximity to such crossing." Okla. Stat. tit. 47, § 11-701(A)(4). In support of its Motion, BNSF points to plaintiff's deposition testimony that there were no obstructions to his view of the train, in addition to reports by its expert, Jay Pfeiffer, and plaintiff's expert, Steven Lett, demonstrating that plaintiff could see approximately seven-hundred feet down the railroad track. (Doc. 39 at 9). BNSF also argues that the video recording supports its position that the train was clearly visible. The video, which is from the perspective of the train, shows plaintiff's vehicle driving toward the railroad crossing on County Road 210 shortly before the collision. (*Id.*, Exh. 6).

Plaintiff disputes BNSF's characterization of plaintiff's testimony and Mr. Lett's report. Specifically, plaintiff argues that he testified that the crossing was more difficult to cross safely than other crossings, and cites to portions of Mr. Lett's expert report that support his position that

the train was not clearly visible. (Doc. 67 at 14). Mr. Lett's expert report provides that, at the time of the collision, it was raining and dusk. (*Id.*, Exh. 2, at 1). Mr. Lett calculated a forty-degree angle between County Road 210 and the railroad crossing. (*Id.*). Mr. Lett opined that the distance from the nearest rail to the point that plaintiff would have stopped would have been "at least 40 feet and more likely 50 feet." (*Id.* at 2). But due to the presence of trees and brush growing on the right-of-way, Mr. Lett determined that "there is not enough sight distance along the track for [plaintiff] to have cleared the crossing with him stopped at anywhere between 40 feet and 50 feet from the nearest rail." (*Id.* at 3). Viewing the evidence in a light most favorable to plaintiff, the non-moving party, the Court finds that there exists a genuine dispute of material fact as to whether the train was plainly visible to plaintiff.

The facts of this case are similar to those in *Ross v. Burlington Northern & Santa Fe Railway Co.*, 528 F. App'x 960 (10th Cir. 2013) (unpublished), in which the Tenth Circuit denied the railroad's motion for summary judgment because the plaintiff had submitted sufficient evidence for a jury to find that the train was not plainly visible under § 11-701(A)(4). The court noted the deficiencies presented by the railroad's video footage, namely that the video was from the perspective of the train, not the driver, and the video did not clearly depict the angle of the vehicle as it approached the crossing. *Id.* at 964. The court further determined that the video provided an "incomplete picture of what a reasonably prudent driver in [the driver's] position would have seen and how much distance there was between the track and the [vehicle] before the train became plainly visible." *Id.* While the Tenth Circuit noted that the video evidence was not unpersuasive, it concluded that plaintiff had met her burden to show that a juror could find in her favor. *Id.* at 965.

8

The Court likewise finds that the video evidence in this case, while not unhelpful, does not "so utterly discredit [plaintiff's] evidence that no reasonable jury could believe [his] version of events." *Id.* Plaintiff's evidence regarding the presence of trees and brush, the time of day and weather conditions, combined with the angle at which he was driving, raises a question as to whether the train was clearly visible to him. Based on the evidence at this stage, the Court finds that a reasonable juror could determine that the train was not clearly visible to plaintiff. Accordingly, summary judgment is inappropriate on this ground as well.

### B. Obstruction Claim

BNSF's Motion argues that any obstruction claim asserted by plaintiff fails as a matter of law. BNSF concedes that plaintiff's Amended Petition does not contain allegations that his view of the train was obstructed, but argues that Mr. Lett's expert report "has stated otherwise." The Court does not find that plaintiff has alleged any obstruction claim under O.A.C. 165:32-1-11, and thus BNSF's request is moot. Moreover, the Court notes that while evidence of obstruction is indeed relevant to a claim brought under O.A.C. 165:32-1-11, it is also "relevant under the defense of negligence *per se* since an element of 47 O.S. § 11–701(a) is whether the 'approaching railroad train is plainly visible.'" *Cornwell v. Union Pac. R.R.*, 2010 WL 3521668, at *6 n.2 (N.D. Okla. Sept. 7, 2010), *aff'd sub nom. Cornwell v. Union Pac. R. Co.*, 453 F. App'x 829 (10th Cir. 2012).

### C. Preemption under the Federal Railroad Safety Act

Plaintiff's suit alleges that the grade crossing at issue "was not protected by automatic signaling devices, flashing lights, or crossing guards or any description, apart from a cross buck sign" and BNSF's failure to use an automatic signal constitutes negligence. (Doc. 4, Exh. 1, at 2). BNSF contends that it is entitled to summary judgment because the Federal Railroad Safety

9

Act ("FRSA"), 49 U.S.C. § 20101, *et seq.*, preempts claims challenging the adequacy of federally funded warning devices at railroad crossings.

The FRSA was enacted to "promote safety in every area of railroad operations and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA grants the Secretary of Transportation the authority to "prescribe regulations and issue orders for every area of railroad safety." *Id.* § 20103(a). FRSA's preemption provision provides, in relevant part:

> Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement.

*Id.* § 20106(a)(2).

The Highway Safety Act established the Federal Railway-Highway Crossings Program (the "Crossings Program"), 23 U.S.C. § 130 (2000), which makes federal funds available to states for improvement and elimination of hazards at grade crossings on the condition of states' "maint[enance of] a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). The Secretary, through the Federal Highway Administration ("FHWA"), issued several regulations pursuant to the FRSA and the Highway Safety Act in its implementation of the Crossings Program. This included federal regulations addressing the design of grade crossing improvements. *See* 23 C.F.R. § 646.214(b). At crossings where certain conditions under (b)(3) exist, such as a multiple main line railroad track,

or a high-speed train,[3] the warning system is adequate if it includes federally-funded automatic gates with flashing lights. Where the (b)(3) conditions are not present, "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." § 646.214(b)(4).

The Supreme Court addressed the preemptive effect of §§ 646.214(b)(3) and (4) in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), a wrongful death action alleging that the railroad had not maintained adequate warning devices at a particular grade crossing. The Court held that §§ 646.214(b)(3) and (4) "establish requirements as to the installation of particular warning devices" and "when they are applicable, state tort law is preempted." *Id.* at 670. The Court reasoned that "§§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained," thus "effectively set[ting] the terms under which railroads are to participate in the improvement of crossings." *Id.* In *Easterwood*, federal funds were initially allocated for the installation of a gate at the railroad crossing in question, but were ultimately used to fund another project. The Court concluded that, in the absence of evidence showing that federal funds were in fact used to install warning devices at the crossing, §§ 646.214(b)(3) and (4) were not applicable and thus the state negligence claim against the railroad was not preempted. *Id.* at 672-73.

---

[3] The full list of conditions under (b)(3) are: (A) multiple main line railroad track; (B) multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing; (C) high speed train operation combined with limited sight distance at either single or multiple track crossings; (D) a combination of high speeds and moderately high volumes of highway and railroad traffic; (E) either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions; and (F) a diagnostic team recommends them. 23 C.F.R. § 646.214(b)(3).

In *Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344 (2000), another wrongful death action challenging the adequacy of warning signs at a railroad crossing, the Supreme Court reached the opposite conclusion. Applying *Easterwood*, the Court found that "§§ 646.214(b)(3) and (4) governed the selection and installation of the [warning] devices" because the Tennessee Department of Transportation used federal funds under the Crossings Program to install the signs. *Id.* at 358. The Court further stated that "because the [Tennessee Department of Transportation] determined that warning devices other than automatic gates and flashing lights were appropriate, its decision was subject to the approval of the FHWA," under § 646.214(b)(4). *Id.* at 358-59. The Court concluded that once the project was approved by the FHWA and the signs were installed using the federal funds, "the federal standard for adequacy displaced Tennessee statutory and common law addressing the same subject, thereby pre-empting respondent's claim." *Id.* at 359.

The Tenth Circuit and Oklahoma courts have applied *Easterwood* and *Shanklin* to assess whether state negligence claims are preempted under FRSA. *See, e.g.*, *Henning v. Union Pac. R. Co.*, 530 F.3d 1206 (10th Cir. 2008) (affirming district court's summary judgment ruling that claim challenging the adequacy of crossbucks and stop sign at railroad crossing was preempted under FRSA); *Hightower v. Kansas City S. Ry. Co.*, 70 P.3d 835, 849-50 (Okla. 2003) ("Since federal funds were used in the installation of warning devices actually installed at the Pickering Street Crossing, the conditions to applicability of §§ 646.214(b) were met in this case, thus triggering federal preemption."); *Short v. Union Pac. R.R. Co.*, 315 P.3d 400, 404–05 (Okla. Ct. Civ. App. 2013) (plaintiffs' inadequate warning claim preempted by FRSA because the reflectorized crossbucks at issue were largely paid for by federal funds).

12

BNSF argues that its evidence conclusively demonstrates that preemption is proper under § 646.214(b)(4). Under the relevant case law, it is clear that two requirements must be met before preemption under § 646.214(b)(4) is triggered: (1) FHWA approval of the project improving the crossing at issue, and (2) installation of the warning devices using federal funds. *Shanklin*, 529 U.S. at 357. While the Court agrees that analysis of § 646.214(b)(4), and not (b)(3) is proper given the absence of any (b)(3) conditions, the Court cannot conclude that BNSF has shown both that FHWA approved the project installing reflectorized crossbucks at the County Road 210 crossing, and that federal funds were used to install the reflectorized crossbucks.

In support of its Motion, BNSF provides the affidavit of Harold Hofener, the former Oklahoma Department of Transportation ("ODOT") Chief Traffic Engineer responsible for administering the railroad grade crossing safety improvement programs at the time the crossbucks in question were installed. (Doc. 39, Exh. 8, ¶ 1). Attached to Mr. Hofener's affidavit are various FHWA, ODOT, and internal railway documents. The evidence shows that on November 17, 1978, ODOT entered into an agreement (the "Crossbuck Agreement") for a "Federal-Aid Railroad Grade Crossings Project" with BNSF's predecessor-in-interest, the St. Louis-San Francisco Railway Company. The Crossbuck Agreement provided for the installation of "approximately 2587 crossbucks, 530 track number signs and 1380 timber support posts, plus 1385 AAR-DOT identification signs" under project numbers RRP-000S(60), RRO-000S(64), and RRP-00S(419). (*Id.*, Exh. 8A). The Crossbuck Agreement made clear that the crossbucks would conform to the design provided in the Agreement, and provided that federal funds would pay for ninety percent of the installation costs and the railroad would be responsible for the remaining ten percent of costs. (*Id.*). On December 6, 1978, ODOT received authorization from

FHWA to proceed with projects RRP-00S(60) and RRO-000S(64). (*Id.*, Exh. 8B). On April 11, 1979, Mr. Hofener authorized installation of the crossbucks under the Crossbuck Agreement. (*Id.*, Exh. 8C). A railroad document titled "Quantities Installed" indicates that two crossbucks were installed at ODOT Number 668436Y, the identification number for County Road 210 crossing, in March 1981. (*Id.*, ¶ 5; *id.*, Exh. 8D). The FHWA's final voucher for payment demonstrates that federal funding accounted for ninety percent of the installation costs for project RRO-000S(64) from December 6, 1978 through January 31, 1990. (*Id.*, Exh. 8E).

While BNSF maintains that the FHWA approved project RRO-000S(64), which included the crossbucks installed at County Road 210, there is no evidence before the Court to support this contention. To be clear, the record lacks evidence specifying the particular crossings approved by the FHWA under project RRO-000S(64), or in other words, whether the County Road 210 crossing was one of the crossings improved under project RRO-000S(64). The record in *Shanklin*, by contrast, included the Tennessee Department of Transportation's request for federal funds containing "information about each crossing covered by the project," which was later granted by the FHWA. *Shanklin*, 529 U.S. at 350. Without this evidence, it is likewise impossible for the Court to conclude that the FHWA voucher, which demonstrates that federal funds were used for project RRO-000S(64), also shows that federal funds participated in the installation of the crossbucks at County Road 210. The law is clear that, in order to trigger preemption under § 646.214(b)(4), BNSF must show that FHWA approved the installation of the cross bucks at issue, and that federal funds were used to install the cross bucks. Given the evidentiary gap linking FHWA's approval of project RRO-00S(64) to the specific crossing at issue in this case, the Court is unable to conclude that plaintiff's inadequate crossing devices claim is preempted under FRSA. *See Morris v. Union Pac. R. Co.*, 2006 WL 2583763, at *5

(E.D. Okla. Sept. 5, 2006) (denying preemption under FRSA where the record was "silent as to what crossings were covered by the FHWA's approval of [the crossbuck project]"), *vacated pursuant to settlement sub nom. Morris ex rel. Phillips v. Union Pac. R. Co.*, 2007 WL 316906 (E.D. Okla. Jan. 29, 2007).[4]

The Court concludes that BNSF has failed to meet its initial burden to show that it is entitled to judgment as a matter of law based on preemption under the FRSA. Summary judgment is therefore inappropriate.[5]

### D. Preemption of Claims Regarding Speed of Train and Adequacy of Locomotive Warning Devices

BNSF acknowledges that plaintiff has not alleged claims related to the speed of the train or adequacy of locomotive devices, but argues that any such claims are preempted. (Doc. 39 at 21-22). Plaintiff has not made any argument indicating that it has asserted either claim, nor is

---

[4] To be clear, the Court's finding is *not* a request for an individualized determination by FHWA that the cross bucks at County Road 210 were inadequate; such a finding would be inconsistent with *Shanklin*. 529 U.S. at 356 (stating that §§ 646.214(b)(3) and (4) apply regardless of whether there has been an "individualized determination of adequacy [of the particular warning devices at the crossing] by a diagnostic team or an FHWA official").

[5] While plaintiff failed to directly respond to BNSF's preemption argument, he appears to suggest that preemption does not bar his suit because he has pled "multiple" theories of negligence, not simply an inadequate warning claim. (Doc. 67 at 12). The Court rejects plaintiff's characterization of his own claim. Specifically, plaintiff asserts that his negligence claims are (1) that the railroad crossing was unusually dangerous and hazardous, and (2) the crossing was not protected by automatic signaling devices. The Court declines to construe these statements as two separate claims of negligence, particularly because plaintiff's Amended Petition clearly alleges a single claim of negligence: "defendant's failure to have an automatic signal at the crossing in question to warn vehicular traffic of approaching trains was negligent." (Doc. 4, Exh. 1, ¶ 6). While plaintiff alleges that the railroad crossing was "an unusually dangerous or extra hazardous grade crossing," (*Id.*, ¶ 5), this allegation on its own is not a "claim" of negligence and instead appears to support plaintiff's contention that BNSF was negligent by failing to use automatic warning devices *because* the crossing was unusually dangerous or hazardous. *See Hightower*, 70 P.3d at 839 (referring to plaintiff's "ultra hazardous crossing" claim as an inadequate warning claim).

there evidence in the record suggesting either claim is at issue. The Court thus finds BNSF's request for summary judgment as to these claims to be moot.

### E. Preemption Manual on Uniform Traffic Control Devices for Streets and Highways

BNSF next contends that Oklahoma's adoption of the 2004 Manual on Uniform Traffic Control Devices for Streets and Highways (the "MUTCD") preempts plaintiff's state tort claim because it constitutes the substantive law of Oklahoma and relieves BNSF from any legal duty to determine the need for, or to install additional warning devices. (Doc. 39 at 22). However, in *Easterwood*, the Supreme Court explicitly rejected this argument, holding that 23 C.F.R. § 646.214(b)(1), which requires all warning devices at crossings to comply with the standards set forth in the FHWA's MUTCD, does not preempt state tort actions. The Court found that the MUTCD "provides a description of, rather than a prescription for, the allocation of responsibility for grade crossing safety between Federal and State Governments and between States and railroads." *Easterwood*, 507 U.S. at 669-70. The Court also pointed to the MUTCD provision clearly stating that it did not impose any legal requirements. *Id.* at 669.

The Court finds no reason to depart from *Easterwood* in the present case. While the MUTCD provision cited by BNSF[6] does indicate that the language regarding allocation of responsibility has been revised since *Easterwood*, the Court finds it to be sufficiently similar to the provision in *Easterwood*. More importantly, BNSF's argument is undermined by the language in the current MUTCD, which clearly states: "This Manual describes the application of traffic control devices, but shall not be a legal requirement for their installation." MUTCD (2009), Section 1A.09. Accordingly, plaintiff's claim is not preempted by the MUTCD.

---

[6] The language provides: "The Highway agency or authority with jurisdiction and the regulatory agency with statutory authority, if applicable, jointly determine the need and selection of devices at a highway-rail grade crossing." (Doc. 39 at 23)

### F. The Statute of Repose

BNSF's final argument is that the statute of repose bars plaintiff's claim regarding the design of the railroad track. (Doc. 39 at 24). The Court has thoroughly reviewed the record and does not find that plaintiff has alleged a negligent design claim in this case. Nor does the Court agree with BNSF that the fact "[p]laintiff's expert is critical of the design of the angle at which the roadway meets the railroad tracks and the roadway's incline on the approach to the crossing," (Doc. 39 at 24) implies that plaintiff has asserted a negligent design claim. The Court further declines to credit plaintiff's arguments in his Response that suggest he has pled a negligent design claim. BNSF's request is therefore moot.

**IT IS THEREFORE ORDERED** that BNSF's Motion for Summary Judgment (Doc. 39) is **denied**.

**SO ORDERED** this 31st day of March, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE