# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **TYLER D. MALINSKI,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **and** ) | |
| ) | **Case No. 15-CV-502-JED-FHM** |
| **PAULA SMITH,** ) | |
| ) | |
| **Intervenor,** ) | |
| **v.** ) | |
| ) | |
| **BNSF RAILWAY COMPANY,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

### I.      Procedural Background

Plaintiff Tyler D. Malinski initially filed this lawsuit in Ottawa County District Court on August 12, 2015, against BNSF Railway Company ("BNSF") for personal injury damages he sustained from a collision between his motor vehicle and a train owned and operated by BNSF. (*See* Doc. 4-1).  BNSF removed the case to this Court on August 28, 2015.

On July 20, 2016, BNSF moved for summary judgment against the plaintiff.  (*See* Doc. 39).  Before ruling on this summary judgment motion, the Court considered Paula Smith's Amended Motion to Intervene (Doc. 74).  Paula Smith is the mother of Nathan Smith, now deceased, who was a passenger in the plaintiff's vehicle at the time of the collision.  The Court granted Ms. Smith's motion on December 5, 2016, and Ms. Smith subsequently filed an Inventor's Complaint (Doc. 119) claiming wrongful death.  In her Complaint, Ms. Smith alleges that her son's "injuries, pain and suffering before death, and death were caused by the negligent and careless acts and omissions" of BNSF.  (Doc. 119 at 2).

The Court denied BNSF's summary judgment motion against the plaintiff on March 31, 2017. (*See* Doc. 129). On May 21, 2018, the Court granted BNSF's Unopposed Motion for Leave to File a Second Summary Judgment Motion (Doc. 159), given the addition of the intervenor and her claims into the case. This second summary judgment motion (Doc. 207) is now before the Court.

BNSF moves for summary judgment on the following grounds: (1) plaintiff violated *Okla. Stat.* tit. 47, § 11-701(A)(3) by failing to stop for a train sounding an audible horn and was therefore negligent per se; (2) plaintiff violated *Okla. Stat.* tit. 47, § 11-701(A)(4) by failing to stop for a plainly visible train and was therefore negligent per se; (3) plaintiff violated *Okla. Stat.* tit. 47, § 11-801 by failing to stop within the assured clear distance ahead and was therefore negligent per se; (4) the Federal Railroad Safety Act ("FRSA") preempts the claims related to the adequacy of warning devices; and (4) the Interstate Commerce Commission Termination Act ("ICCTA") preempts the plaintiff's and intervenor's claims as a matter of law. Because the Court finds that plaintiff violated *Okla. Stat.* tit. 47, § 11-701(A)(3) and, thus, was negligent per se, the Court's discussion of the undisputed facts and analysis of the law will be limited to this issue.

## II. Undisputed Facts Related to the Sounding of the Horn

On December 4, 2014, a collision occurred between a train owned and operated by BNSF and a motor vehicle driven by plaintiff. The collision took place at a railroad grade crossing on County Road 210 near Afton, Oklahoma. This particular railroad crossing is protected by crossbucks only.[1]

---

[1] "Crossbucks are black-and-white, X-shaped signs that read 'RAILROAD CROSSING.'" *Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1211 n.4 (10th Cir. 2008) (internal quotations omitted).

The lead locomotive on the BNSF train at issue was equipped with a video recording device that captured the collision. The front end of the plaintiff's vehicle is visible in the video at a point when it was approximately ninety-nine feet from the nearest rail. The video reflects that the locomotive sounded its horn for approximately fifteen seconds prior to the accident. The train's event data recorder also indicates that the horn was blown. (Doc. 207, Exh. 8). The horn on the train's lead locomotive was tested ten days after the collision and produced a sound level of 100.5 dB(A) (decibels) from a distance of 100 feet in front of the locomotive.

## III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In considering a summary judgment motion, courts determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 at 251-52. The evidence of the non-movant is to be taken as true, and all justifiable inferences are to be drawn in non-movant's favor. *Anderson*, 477 U.S. at 255; *see also Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Anderson*, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"When the moving party has carried its burden under Rule 56[a], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). When the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Id.* (quotations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## IV. Discussion

### A. Negligence Per Se

"To constitute negligence per se, (1) the violation of a statute or ordinance must have caused the injury, (2) the harm sustained must have been of a type intended to be prevented by the statute or ordinance, and (3) 'the injured party must be one of the class intended to be protected by the statute.'" *Hamilton v. Allen*, 852 P.2d 697, 699 (Okla. 1993) (quoting *Ohio Casualty Ins. Co. v. Todd*, 813 P.2d 508, 510 (Okla. 1991)). A party's negligence per se breaks the causal chain between a defendant's negligence and the injury if the negligent per se party's actions are the proximate cause of his injury. "Generally, the proximate cause of an injury in a negligence case is for the jury to determine. It becomes a question of law for the court only when there is no evidence from which a jury could reasonably find a causal nexus between the defendant's alleged negligent act and the injury." *Akin v. Mo. Pac. R.R. Co.*, 977 P.2d 1040, 1054 (Okla. 1998).

BNSF asserts that plaintiff violated Okla. Stat. tit. 47, § 11-701(A)(3) by failing to stop for a train sounding an audible horn. Section 11-701(A) imposes a duty on motorists approaching railroad crossings to stop within fifty feet but not less than fifteen feet from the railroad when:

1. A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

2. A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train;

3. A railroad train approaching within approximately one thousand five (1,500) hundred feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard;

4. An approaching railroad train is plainly visible and is in hazardous proximity to such crossing; or

5. The tracks at the crossing are not clear.

Okla. Stat. tit. 47, § 11-701(A)(1)-(5). The Oklahoma Supreme Court has held that a driver's "failure to conform to the requirements of [§ 11-701(A)] is negligence per se." *Akin*, 977 P.2d at 1055. Moreover, the Oklahoma Supreme Court has held on multiple occasions that a driver's negligence in violating § 11-701(A) constituted "*the supervening,* and *therefore, proximate cause*" of a resulting collision with a train, which "insulates the railroad from the legal consequences of its own lack of due care, if any." *Id.* at 1056 (italics in original); *see also Hamilton*, 852 P.2d at 700 ("Hamilton's failure to obey the statute and heed the warnings broke the causal chain and were the proximate cause of his injuries.").

There is no dispute that plaintiff failed to stop his vehicle as he approached the railroad. Nor does there appear to be a dispute that the harm sustained by plaintiff was of a type intended to be prevented by § 11-701(A)(3), or that plaintiff was one of the class intended to be protected by the referenced statutes. The only remaining issue, then, is whether the train in this case emitted an audible signal as it approached within approximately 1,500 feet from the crossing, thus triggering plaintiff's duty to stop.

In this Court's opinion denying BNSF's first summary judgment motion, the undersigned held that BNSF had not established that the train's horn was audible from approximately 1,500 feet, as required by the statute. The testing conducted on the horn after the accident demonstrated that it produced a sound level of 100.5 decibels at 100 feet, but there was no evidence that this test

result meant that the horn was audible at approximately 1,500 feet. In its second summary judgment motion, BNSF has provided further explanation and evidence supporting its proposition that the train's horn was audible at approximately 1,500 feet.

First, BNSF has provided evidence that a local resident, Jacob Nacoste, who lives over 1,500 feet from the crossing is able to hear train horns from his residence. (Doc. 207, Exh. 10). Though the plaintiff and intervenor argue that Nacoste only hears the train when he is paying attention, this does not undermine the implication that the locomotive horns are *audible* from over 1,500 feet away.

Next, BSNF points to the legislative history behind the federal regulations setting the decibel range and sounding requirements for locomotive horns. The Federal Railroad Administration (FRA), which is part of the U.S. Department of Transportation, is the agency tasked with "ensuring that America's railroads are safe for both railroad employees and the public." *Use of Locomotive Horns at Highway-Rail Grade Crossings; Interim Final Rule*, 68 Fed. Reg. 70586, 70587 (Dec. 18, 2003). In developing these regulations for locomotive horns, the FRA explained that it considered all of the competing interests involved, including the interests of those who may suffer in the event of a collision and of those who may be disturbed by the sounding of the horns. 68 Fed. Reg. 70586, 70587. "Considerable effect [was] expended to establish and quantify . . . the level of sound that needs to be delivered to be detectable." *Id*. at 70610. The FRA specifically examined detectability "at passive crossings where no other audible or visual warning device is present and where vehicles typically are approaching the crossing at speed." *Id*.

After conducting research and eliciting public comments, the FRA decided to require that lead locomotives be equipped with a locomotive horn that produces a minimum sound level of 96 decibels and a maximum sound level of 110 decibels, measured at 100 feet forward of the

locomotive in its direction of travel. 49 C.F.R. § 299.129(a); *see also Use of Locomotive Horns at Highway-Rail Grade Crossings; Final Rule*, 71 Fed. Reg. 47614, 47666 (Aug. 17, 2006). Moreover, the locomotive horn must begin sounding at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing. 49 C.F.R. § 222.21(b)(2). Locomotives traveling in excess of 60 miles per hour must not begin sounding the horn more than one-quarter mile in advance of the crossing, even if the advance warning provided will be less than 15 seconds in duration. *Id*. at § 222.21(b)(3). One-quarter mile (or 1320 feet) from the crossing was set as the outer limit for sounding the horn because sound diminishes over distance, and the agency determined that the horn noise beyond one-quarter mile would be excessive. As explained by the agency, "the sound from a locomotive horn registering 100 dB(A) at 100 feet in front of a locomotive will have diminished to roughly 75 dB(A) at one-quarter mile in front of the locomotive." 68 Fed. Reg. 70586, 70627. One-quarter mile, then, "is near the outer margin of utility in terms of alerting the motorist to oncoming trains at that crossing." *Id*. The implication from this statement is that a horn registering at 100 decibels at 100 feet <u>is</u> useful for alerting motorists <u>within</u> the quarter-mile (or 1320-foot) range. In fact, a fast-moving train (moving in excess of sixty miles per hour) must begin sounding its horn at the quarter-mile mark in order to satisfy the regulations, which suggests that the utility of doing so—to alert motorists—was determined to outweigh the risk of unnecessary noise.

Given Mr. Nacoste's testimony and the rationale behind the FRA's locomotive horn regulations, the Court can only infer that the locomotive horn in this case—which tested within the required decibel range and was sounded in accordance with 49 C.F.R. § 222.21(b)(2)—was

audible from the distance at which it was sounded.[2]  The plaintiff, then, had a duty to stop pursuant to § 11-701(A)(3).  Because plaintiff failed to stop as required, he was negligent per se.  *See Hamilton*, 852 P.2d at 699 (holding that a violation of § 11-701(A) constitutes negligence per se); see also *Akin*, 977 P.2d at 1055.

The Court further finds that plaintiff's negligence was the proximate cause of the collision. "The question of proximate cause is for the jury where there is competent evidence demonstrating that a motorist was not warned of a train's impending approach." *Nye v. BNSF Ry. Co.*, 428 P.3d 863, at ¶ 35 (Okla. 2018).  In *Nye v. BNSF Railway Company*, the Oklahoma Supreme Court found that the plaintiff-motorist had presented evidence "that directly contradicted BNSF's assertions that the horn was blown." *Id*.  The passenger testified that he was "110 percent sure" that the train had not sounded its horn, and several other witnesses asserted that BNSF only sounded the train's horn "[a]bout half the time." *Id*.  A motorist who had been traveling behind the plaintiff also asserted that he did not hear the train sound its horn.  The *Nye* court concluded that the resolution of whether the plaintiff had violated § 11-701—and, thus, the issue of proximate cause—was "squarely within the jury's purview." *Id*. at ¶ 36.

Similarly, in *Ross v. Burlington N. & Santa Fe Ry. Co.*, the Tenth Circuit held that BNSF was not entitled to summary judgment based on its argument that plaintiff violated § 11-701(A)(3)

---

[2] Although neither BNSF's second summary judgment motion nor the plaintiff's and intervenor's joint response discuss the speed of the train, BNSF's initial summary judgment motion asserted (with no opposition) that the train was moving at approximately fifty-five miles per hour at the time of the collision.  (*See* Doc. 39 at 6, ¶ 34; Doc. 67 at 11, ¶ 34; Doc. 129 at 2).  BNSF's Exhibit 8 appears to confirm this figure.  (*See* Doc. 207, Exh. 8).  Assuming the train was moving at fifty-five miles per hour as it approached the crossing, the train's locomotive horn would have sounded for approximately 1210 feet before the collision.  Importantly, the plain language of § 11-701(A)(3) places a duty on a driver to stop when the train's horn is sounded within *approximately* 1500 feet of the crossing.  The Tenth Circuit has interpreted this to mean that a driver's duty to stop is triggered when a train sounds its horn at a distance of 1100 feet. *Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1221 (10th Cir. 2008).

when the plaintiff submitted evidence that "(1) the [deceased motorist's spouse] was at the crossing . . . and did not recall hearing the train's signal; (2) another motorist driving parallel to the train on the other side of the tracks did not recall hearing the horn blasts; (3) crew members aboard the train did not recall hearing the horn blasts; and (4) an expert opined that [the motorist's] position inside the road grader would 'have posed a significant acoustical barrier' to the train's signal." 528 F. App'x 960, 966 (10th Cir. 2013) (unpublished).

In this case, the plaintiff and intervenor point to the testimony of Mr. Nacoste, the local resident, who testified that "[i]f you have the windows up and the radio going down that dirt road, and you're doing 40 miles an hour, you're not going to hear that train whistle." (Doc. 261, Exh. 5 [Nacoste Dep., pp. 24-25]). According to Mr. Nacoste, "[t]here's too much rock noise and vehicle noise" in those circumstances to hear the signal. *Id.* However, as articulated by the Tenth Circuit in *Ross v. Burlington Northern & Santa Fe Railway Co.*, the relevant question is "whether the train emitted a signal that would have been audible to a reasonably prudent driver in [the plaintiff's] position at the crossing." 528 F. App'x at 966. The plaintiff and intervenor cite no case law supporting the proposition that a driver's decision to play loud music with the windows up obviates his duty to stop upon the sounding of a locomotive's horn that is otherwise audible from his location at the crossing.

The plaintiff and intervenor also argue that the "humped" crossing and rough crossing surface may have diverted the plaintiff's attention. (Doc. 261 at 30 of 49). Assuming this is true, the Court is not persuaded that such distractions would negate the driver's duty to stop under § 11-701(A)(3). In *Akin*, the Oklahoma Supreme Court opined that it was impossible to know for sure why the plaintiff "did not see, ignored, or otherwise failed to perceive the numerous warnings of the presence of a train," but the court still found that the plaintiff's failure to stop pursuant to § 11-

701(A) was the proximate cause of his death. 977 P.2d at 1056. In this case, the plaintiff may have failed to perceive the locomotive's horn, even though it was capable of being heard. As long as it was capable of being heard, the statutory duty to stop was triggered.

Unlike in *Nye* or *Ross*, the plaintiff and intervenor in this case have brought forth no evidence that the locomotive's horn was inaudible. Instead, the undisputed evidence here demonstrates that plaintiff violated § 11-701(A)(3) and was, thus, negligent per se. As in *Akin*, plaintiff's failure to stop at the crossing despite an audible warning "was the *supervening*, and *therefore, proximate cause*" of the collision." *Akin*, 977 P.2d at 1056. His "action in entering the crossing, as conclusively established by the record, constitutes a supervening act of negligence which insulates the railroad from the legal consequences of its own lack of due care, if any." *Id*. Hence, BNSF is entitled to summary judgment in its favor on all claims brought by the plaintiff and intervenor.

**IT IS THEREFORE ORDERED** that BNSF's Motion for Summary Judgment (Doc. 207) is **granted**. Because the Court did not rely on the testimony, evidence, or affidavits of Jeffrey Estes and Timothy Huya in this Opinion, the plaintiff and intervenor's Motion to Strike (Doc. 261 at 8-10 of 49) is **moot**.

**IT IS FURTHER ORDERED** that, in light of the Court's ruling, the motions in limine and other pretrial motions filed by the parties (Doc. 168-171, 174, 177-182, 184-194, 196-199, 201-206, 208) are now **moot**. The remaining deadlines in the Scheduling Order are hereby stricken.

Moreover, it appears to the Court that BNSF's counterclaims for indemnity and contribution are now moot. BNSF shall provide a brief status report by December 11, 2018, as to its intent concerning these counterclaims.

**SO ORDERED** this 4th day of December, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE